**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| **PEOPLE OF THE UNITED STATES**, <br> Plaintiff, <br> Vs. <br><br> **MOHAMMAD ALKARAMLA**, <br> Defendant. | **No. 09-CR-271** |

### DEFENDANT'S VERSION OF THE OFFENSE

NOW COMES the Defendant, **MOHAMMAD ALKARAMLA**, by and through his attorneys, Mr. Philip L. Bernstein and Mr. James Maher, and presents the following Version of the Offense:

Defendant was born in Jordan and immigrated with his mother, father, and two sisters to the United States when he was thirteen years old. He had never been in Israel, Palestine or the Gaza strip. He had married his cousin, Neur while in Jordan resulting in the birth of a son Adam. Defendant has no criminal record. His wife came to stay with him and his family in December of 2008. The relationship became acrimonious virtually upon her arrival to the United States, culminating with Mohammad's contention that his wife continuously threatened to move to Jordan with the couple's son, Adam.

The offense is a base level 12. The offense should be reduced by eight (8) levels and in support thereof the Defendant presents the following:

**Defendant Evidenced Little Or No Deliberations (4 pt Reduction)**.

Pursuant to Section 2 A (6) .1 (b) (5)

1

The act complained of in the case at bar is the delivery of one letter, once and only –once. The s a single incident. The letter consists of only one threat. The act was not the result of a violation of a court order. The act did not cause a substantial disruption to Government functions i.e. law enforcement did not need to clean or decontaminate.

Ida Crown Center Dean Matanki testified that there had been no threats prior to the receipt of the suspect letter or any threats thereafter. There were no threatening phone calls prior to or after the receipt of the suspect letter. There were no subsequent letters.

Clearly this threat was the product of a single impulse.

There is no allegation that Mohammad Alkaramla was connected to any radical groups or other individuals involved in such activity. All the evidence indicates that this was a very troubled, depressed anxious young father in the midst of a domestic crisis.

He was not involved in any conspiracy or hate group. This was a personal mistake committed by a very troubled young father in the midst of losing custody of his son. Using the *Palsgraf* "but for test" **Palsgraf** *v. Long Island R.R. Co.,* 248 N.Y. 339, 352, 162 N.E. 99, 103 (1928) this offense would have never occurred. In other words but for his wife' (at the time) threat to take Adam to raise Adam in Jordan this offense would not have occurred.

*This was an act that had been born of the moment that had also died in that same moment.*

**Facts and Law Do Not Support A Hate Crime Increase**

There is no reason that the level ought to be increased due to a hate crime contention. The letter discusses the requirement of Israel to exit the Gaza territory. There is no mention in the letter of a hatred of Jews. The letter refers to a war in a particular area of the world and does not indicate that its author harbors any hatred for a people of a certain

faith. It would have made no difference if this matter involved a conflict between England and the IRA or a war between China and Japan—the issue was the protection of his son from a violent war torn part of the world. His desire to attempt Israel to stop the war in Gaza cannot be equated to a hatred of Jews. There are many Jews in Israel that believe Israel should withdraw from the Gaza strip. It cannot therefore be rationally argued that liberal Israeli Jews harbor a hatred for Jews because they do not believe that Gaza should be part of Israel.

Mohammad's concern did not involve a hatred of Jewish people but instead his concern involved his son' presence in the midst of a middle-eastern conflict. Although he had never been in Israel, Palestine or the Gaza he writes that everyone knows about the conflict as it is constantly in the news, radio and television. Again Using the "Palsgraf" test "but for" referencing the custody conflict, this incident would have never occurred. In other words it is obvious that Mohammad would not have committed this offense as a result of a hatred of Jews. There is simply no evidence that he would have. He has been in the U.S. for over twelve years without any indication that he harbored a hatred for Jewish people i.e. no arrests, complaints connections with radical groups etc.

It is no coincidence that the crime occurred within the first month of his wife's arrival and the realization that he was going to lose his son. Clearly this is a crime born from a desperate confused depressed father –obsessed not with Jews but instead obsessed with the concern and guilt he bore for his perceived inability to protect his son.

## Acceptance of Responsibility (2-PT. Reduction)

It must be noted that the Mohammad did attempt to enter a plea of guilty in this matter and thereby accepted responsibility for this offense. Mohammad, however, was not able to answer all of the questions posed to him by this Court in a manner acceptable to the Court. It must also be pointed out as well that Mohammad's ability to understand the

3

nature of these proceedings is somewhat suspect.  At the plea hearing he appeared confused and anxious. .  Mohammad has been prescribed medicine for depression and anxiety.  It should be acknowledged that Mohammad's father and mother are also both first cousins. Whether or not this has created certain perceptible mental deficiencies would be a matter of psychiatric expert analysis.  The reports tendered to date do not indicate any significant mental deficiencies (considerable depression and anxiety but no retardation or other noteworthy mental limitations) however it does not appear that Mohammad informed either the psychologist or the psychiatrist of the familial relationship between his parents.

Nevertheless and with the aforementioned in mind it was the defendant's desire to resolve his case, accept responsibility and move forward to his sentencing hearing so that he would be able to explain the circumstances surrounding the offense and more particularly attempt to present his state of mind to the Court particularly beginning with the arrival of his wife in December 2008.

After this Honorable Court refused to accept Mohammad' plea , defense counsel returned to a focus on the validity of the aspects of the Government's case including an analysis of the language of the letter as compared to the language of the statute.  The letter contained two contingencies and therefore as a matter of law the Government did not establish the corpus delecti of the offense.  Counsel also established that the stamp did come from the booklet found in the apartment and that a full unknown fingerprint was found on the envelope that was not Mohammad's but for some unknown reason was never submitted

4

to AFIS. The print found on the label belonging to Mohammad may have been placed there 7 years ago and the fact that it was upside down indicates that he did not read the name and address of the purported addressee and therefore had nothing to do with its creation and delivery.

Regardless, we should not hold counsel's attempt to challenge the sufficiency of the indictment, foundational issues, i.e. the Government did not lay a proper foundation for the admission of the letter and therefore it should not have been admitted, against the defendant. The defendant did not testify and therefore he made no attempts to mislead this Honorable Court. In fact he entered into stipulations in order to limit the proceedings so that the Court would focus on the sufficiency of the indictment and technical foundation issues and so that the People would not be forced into extracted time, expense and litigation.

It would not be fair to deny Mohammad responsibility acceptance points because he was unable to give this Court sufficient answers to complex state of the mind questions or because Counsel attempted to test the sufficiency of the indictment.

Mohammad agreed to be interviewed by probation and executed all documents requested by probation. He submitted all records and personal letters.

**Pre-Trial Record**

5

After his arrest and based upon his community and family contacts low risk of flight or danger to the community the Magistrate placed Mohammad on home confinement later modified to curfew only. During this entire time frame (a year and a half) and despite his ability to move freely there have been no allegations of criminality, flight or violence. All laboratory drops have been negative.

At all times, Mohammad demonstrated a strong desire to work to support his young son, Adam. In fact he was able to obtain employment as a regular employee with benefits however when his employer learned of this indictment he terminated him.

Mohammad has appeared in Court in a timely manner and has been respectful of this Honorable Court, all court personal, Defense Counsel and Counsel for the People.

### Downward Departure Due to Mental And Emotional Condition (2 pt Reduction)

Mohammad has suffered enormously since his domestic problems began with the arrival of his wife in December 2008. And in particular the realization that he was going to lose his son in the custody dispute. The psychiatric and medical reports indicate depression and difficulty dealing with stress. We cannot discount the possibility that the fact that his parents are first cousins has had a bearing on his competency. "A first-cousin marriage has a coefficient of inbreeding of 1/16. The added risks for first cousins depend not only upon this coefficient of inbreeding but also upon their genetic family histories and, in some cases, upon test results" However, there are always added risks from the mating of closely related persons and those risks are not negligible. *(MedicineNet.Com.)*

The record indicates a loss of weight feelings of helplessness, hopelessness and the inability to sleep. Courts have held that a downward sentence departure was justified

6

based on the offender's mental and emotional condition.  A downward departure based on reduced mental capacity resulting from severe depression is warranted in the case. U.S.S.G. Sec. 5 H1.3.  He is suffering both physically and psychologically.  His weight has dropped for 185 pounds down to 150.   One psychiatric report notation depicts that he wants to sleep and never wake up.  Equally significant is that his risk assessment for homicidal risk is low.  ***This is a depressed young father not a violent one.***

### CLOSING

Mohammad is a caring loving father desirous of the survival of his son in a dangerous part of the world. He had been on pre-trail release for a year and a half with no allegations of criminality, flight or violence.  Mohammad at all times demonstrated a strong desire to work to support his young son, Adam.  The district court should impose the minimum term required to satisfy the purposes of sentencing –just punishment, deterrence, protection of the public and rehabilitation of the Defendant. *M 18 U.S.C. Section 3553 (a).*   United States v. Cull, 446 F. Supp. 2d 961, 963 (E.D. Wis. 2006); Unites States v. Ferguson, 456 F. 3d 660, 667 (6th Cir. 2006).  An examination of the Section 3553 sentencing factors and the psychiatric reports would indicate that there is little to protect the public from further crimes of the Defendant as he had never committed one before or after.   ***One act should not define this man for the rest of his life***.

Mohammad is in dire need of continued psychiatric treatment and domestic counseling to enable him to understand and tolerate his son's living in Jordan.  All caring thinking and humane parties in this case know that Mohammad, a non -violent depressed young father is no terrorist.  He has no history of violence or criminality whatsoever.  Mohammad's greatest desire is to raise his son in a safe land full of opportunity and hope, the United States.  Perhaps one day his dream may still become a reality.

Therefore the offense classification should be a 4.

Mohammad resides in a unique area of Chicago. The West Rogers Park neighborhood consists of people of every faith, religion and culture. It is rare to find anywhere in this Country an area that includes people of such wide diversity including Krishnas, Buddhists, Muslims, Jews (Orthodox, Conservative, and Reformed) Christians, Sikhs, and so many others. Mohammad should be required to perform, community service at a synagogue and his counsel will be glad to volunteer his time to assist in its implementation.

Let us take the negative connotations of this incident and use it as an opportunity to heal. With all the emotional issues surrounding issues of faith and religion in today's world it is time to join together and realize that we all value and share the most common fundamental desires the wellbeing of our families and most importantly the protection of the most diminutive amongst us, our helpless little children.

Respectfully submitted,

_____

Philip L. Bernstein
James Maher
8044 N. Overhill
Niles, Il 60715
773-710-8258
Attorneys for Mr. Alkaramla.

8