UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 271 |
| v. | ) | |
| | ) | Judge Rebecca Pallmeyer |
| MOHAMMAD ALKARAMLA | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, submits the following memorandum concerning sentencing for defendant Mohammad Alkaramla.

### I.    Factual and Procedural Background

This is a bomb threat case in which defendant Mohammad Alkaramla was charged on April 1, 2009 in a single-count indictment for violating 18 U.S.C. § 844(e). The charge stemmed from defendant's involvement in creating and mailing a typewritten threat letter which the United States Postal Service delivered to the Ida Crown Jewish Academy ("ICJA") in Chicago, Illinois on December 31, 2008.

A change of plea hearing was conducted on February 1, 2010, but the Court did not accept defendant's plea because defendant was unable to admit his crime. After defendant heard the basic facts and evidence which the Government would prove if the matter were to proceed to trial, the Court asked defendant if he disagreed with anything that was said. 02/01/10 Hearing Trans. at 20. In response, defendant claimed that he "was under the influence when actually that happened," and then contended that he did not know what was he was doing when he issued the threats. *Id*. Defendant also maintained that he was not acting intentionally. *Id*. Accordingly, the Court declined

1

to accept a guilty plea, finding that defendant did not acknowledge his guilt under oath. *Id*. at 21. A bench trial was thereafter scheduled.

On July 20, 2010, following two days of testimony, the Court found defendant guilty of the charge and remanded him into custody pending sentencing. The following relevant facts, among others, were established beyond a reasonable doubt at the trial.

The ICJA is a secondary school which provides an Orthodox Jewish religious education to students who are from the Chicago-area Jewish community. In December 2008, the school had on its property several religious symbols identifying its religious nature and orientation, as well as its support for the State of Israel. Moreover, the students and faculty followed a religious dress code and were required to dress according to Orthodox Jewish customs. For example, male students wore articles of faith such as the yarmulke. Students dressed this way were visible during school hours, milling about the school's campus.

On December 31, 2008, a school administrator, Michael London, received and reviewed a typewritten letter and envelope which alarmed him. On the envelope, the writer prefaced the address of the school with the word "ATTENTION." The envelope had a stamp and a postmark of December 30, 2008, as well as bar-coding which reflected that it had been mailed. London did not recognize the purported sender's name or the return address. Subsequent testimony established that the envelope had a fictitious sender and fictitious return address.

Upon reading the contents, London recognized that the letter made a threat to the school. The letter, which was addressed to numerous rabbis and leaders in Chicago's Jewish community, contained the following alarming text:

> Will Give You until 01.15.2009 to back OFF from Gaza in Palestine or will set our explosive in your areas, it very important to make a quick action before we make our decisions to set bombs in the fowling addresses...

2

This text was followed by 22 addresses corresponding to Chicago-area Jewish educational centers. Fearful and nervous, London called Rabbi Leonard Matanky, the head of the ICJA, to inform him of the threat and to ask what to do.

Upon hearing about the letter and its contents, Matanky came to the school, read the letter, and called 9-1-1. Like London, Matanky also found the letter alarming, especially because of its timing and the reference to "Gaza in Palestine" and the ongoing conflict over the Gaza Strip. Moreover, like London, Matanky explained that he took the threat very seriously because the school not only was populated by students, faculty, and many other potential victims, but was a "high-profile" institution that had on campus many symbols and signs reflecting the school's religious nature, heritage, and support for Israel.

In the days immediately following the threat letter's receipt, the ICJA was required to incur a great deal of expenditures to keep the occupants safe. PSR at 5. Security guards were retained, security cameras were installed, and a security wall was constructed. *Id*. In total, the ICJA incurred an out-of-pocket cost of $52,755.83 when it pursued these security enhancements. *Id*.

As Rabbi Matanky explained, besides these direct costs associated with defendant's crime, the threat had an even more heinous effect -- an effect upon the psychological well-being of the ICJA community. The school community suffered much anxiety, fear, and anguish when the letter was received, and before the deadline passed. *Id*. In his testimony, as well as his victim impact statement, Rabbi Matanky explained that for the approximately two-week period before the January 15, 2009 deadline, there was "panic," and some children did not return to school until after the deadline passed. *Id*. There was also a high rate of absenteeism on January 15, 2009. *Id*. In addition, ICJA implemented lockdown drills, which the children found frightening. *Id*.

Overall, in Rabbi Matanky's view, in the aftermath of the threat letter's receipt, the mood of the ICJA community was unparalleled in the school's history. The consequences of defendant's threat resembled the mood of the school following the September 11th attacks. *Id*. And, the aftermath of the crime was not limited in scope to those at the ICJA itself. The other 22 schools to whom defendant addressed his threat were similarly shaken. *Id*. As Rabbi Matanky explained, the defendant's threat was a "direct threat to 7,000 children." *Id*.

## II.     The Probation Office's Guidelines Calculations are Correct.

The Government agrees with the Guidelines calculations outlined in the Presentence Investigation Report ("PSR"). The PSR calculates the offense level applicable to defendant as follows:

| Guidelines Provision | Points |
|---|---|
| § 2A6.1(a)(1) Base Offense Level | 12 |
| § 3A1.1(a) Hate Crime Motivation | +3 |
| **Total Offense Level** | **15** |

According to the PSR, at Level 15, with a Criminal History Category of I, defendant falls in Zone D and is eligible for an advisory Sentencing Guidelines range of 18-24 months' imprisonment. *See* PSR at 5-7, 12.

### A.     There is No Basis for the Four-Point Reduction under § 2A6.1(b)(6).

Citing Guideline § 2A6.1(b)(6), defendant argues that he should receive a four-level reduction in the offense level because "the offense involved a single instance evidencing little or no deliberation." However, assuming that this offense involved a "single instance," defendant is not eligible for this reduction because the offense conduct evidenced more than little deliberation within

4

the meaning of the Guidelines. That defendant acted with significant deliberation is reflected by the following facts, among others:

- At some point before he mailed it, defendant created the letter on a computer in his possession.

- In the process of creating the letter, defendant used the internet and Google to search for telling terms such as: "Jewish elementary schools in Chicago;" "sample of thread [*sic*][threat] letter;" "bomb threat attack israel letters;" and "bombattack israel letters."

- In order to find the addresses of the schools to which he addressed the letter, defendant accessed the ATT.org website and then cut and pasted the address of certain local schools into the letter. However, he appears to have deliberately omitted from the letter schools which are located outside the Chicago area.

- Defendant created labels to generate both the fictitious return address for sender "Maul Bericeno" and the address for the recipient.

- Defendant affixed the address labels to the envelope.

- Defendant affixed a stamp to the envelope.

- Defendant carried the letter to a post-box and mailed it.

These facts make plain that defendant's conduct involved a number of deliberate, thoughtful steps and was thus outside of the scope of the four-level reduction. Several Circuit courts have found that the existence of such facts does not warrant a four-level reduction under § 2A6.1(b)(6).

For example, in *United States v. Sanders*, a case where the defendant was convicted of mailing threatening letters under 18 U.S.C. § 876, the Ninth Circuit upheld a lower court's decision to not apply the four-level reduction where the defendant "looked up addresses of particular organizations and selected particular victims." 41 F.3d 480, 485 (9th Cir. 1994). The Ninth Circuit concluded that under those facts, the defendant, who sent two threatening letters to members of two distinct ethnic groups, engaged in conduct which showed "deliberation" and would thus not qualify for the 4-level reduction. *Id*.

Deliberation was also cited in *United States v. Stevenson*, where the defendant was convicted of threatening to assault a probation officer, in violation of 18 U.S.C. § 115(a)(1)(B), after he mailed a threat letter. 126 F.3d 662, 666 (5th Cir. 1997). The defendant secured stationery and postage, composed the threat letter, searched for addresses, and took the letter to be mailed. *Id*. at 665. According to the Fifth Circuit, these actions were "not a spontaneous, momentary action done out of opportunity or impulse." *Id*. Rather, the Firth Circuit observed that there "were many steps along the way in which he could have stopped himself, but he didn't. *Id*.

Similar analysis was employed by the First Circuit in *United States v. Freeman*, where the defendant was convicted of transmitting a threat via the phone, in violation of 18 U.S.C. § 875(c). 176 F.3d 575 (1st Cir. 1999). Unlike Alkaramla's case, there were numerous threats made in *Freeman*, but the First Circuit, citing *Stevenson*, also viewed as instructive the fact that "there were many steps along the way that he [(the defendant)] could have stopped himself, but he didn't." *Id*. at 580.

In another similar case where the defendant sent threatening letters, a District Court in Minnesota refused to apply a reduction under § 2A6.1(b)(2), on the ground that:

> [T]he process of obtaining an address, conveying his thoughts onto paper, taking that paper to a mailbox, and mailing the letter shows the deliberation that was involved. This process is different than making a single oral threat on the spur of the moment, or other conduct which might warrant the reduction.

*United States v. Bellrichard*, 801 F. Supp. 263, 265 (D.Minn.1992).

Based upon these decisions, as well as the above-cited facts of this case, there is no basis for a four-point reduction under § 2A6.1(b)(6). Defendant acted with significant deliberation, and had multiple opportunities to stop himself from sending the threat letter.

**B.      The Hate Crime Motivation Enhancement Under § 3A1.1 Applies to this Case.**

Defendant challenges the application of § 3A1.1(a) ("Hate Crime Motivation") to this case. In explaining his actions, defendant appears to make the incredible claim that he did not target the ICJA because of its religious faith and orientation, but because he believed that the institution could somehow change geo-political affairs in the Middle East and affect the life of his infant son, who lived with defendant's wife in Jordan. Def. 08/27/10 Letter to the Court. Under this version of events, in the days immediately before he mailed the threat letter, defendant claims there was much marital discord in his home as he and his wife, who came to Chicago from Jordan eleven days earlier, on December 20, 2009, argued over their infant son. *Id.* Because his wife threatened to take the child back to Jordan, defendant claims that he was fearful for the child's safety in light of the ongoing Gaza conflict. *Id.* Consequently, the threat letter was supposedly directed at the school not because the school was a Jewish religious institution, but because it was a body which supported the State of Israel. As proof for his motivation, defendant cites the words of the threat, which discuss "the requirement of Israel to exit the Gaza territory. There is no mention in the letter of a hatred of Jews." Def. Version of the Offense at 2. Or put another way, for defendant:

> the issue was the protection of his son from a violent war torn part of the world. His desire to attempt Israel to stop the war in Gaza cannot be equated to a hatred of Jews... Mohammad's concern did not involve a hatred of Jewish people but instead his concern involved his son's present in the midst of a middle-eastern conflict....

*Id.* at 3.

The line defendant attempts to draw was recently rejected by the Second Circuit when it upheld the application of § 3A1.1(a) in a terrorism case, *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 153 (2d Cir. 2008). In that case, after being convicted for his role in the terrorist bombings of the U.S. Embassies in East Africa, defendant El-Hage claimed that

7

"political beliefs," not hatred, motivated his actions, and argued that he should not be subject to the enhancement in § 3A1.1(a). *Id*. The court did not accept this distinction.

> The line El-Hage draws between political activism and hate as the basis for the selection of his victims is a false distinction. It may be that some who choose their victims on the basis of their 'actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation," U.S.S.G. § 3A1.1(a), do so for reasons that could be construed in some fashion as "political" in nature, and others do so for reasons more closely akin to blind, irrational hatred. Even assuming that a court could classify some motives as essentially 'political' and others as rooted in 'hatred,' however, such a classification would be utterly irrelevant to the applicability of the hate crime enhancement. This is so because the enhancement does not turn on an evaluation of the considerations that motivated a defendant's decision to target victims based on their race, color, religion, or other enumerated characteristic. The hate crime enhancement applies if the defendant 'intentionally selected any victim' on the basis of one of the factors listed above, § 3A1.1(a) , and, because there can be no 'good reasons' for doing so, the underlying motivations is simply beside the point.

*Id*. at 153-54.

The rationale espoused by the Second Circuit applies equally to this case. The Hate Crime enhancement would apply here because the victims in this case were intentionally selected on the basis of one (or more) of the factors set forth in § 3A1.1(a) -- religion, national origin, and ethnicity. Even if defendant's purported political reasons for intentionally selecting his victims were true, as the Second Circuit explains, those reasons are "beside the point." 552 F.3d at 54. Defendant conducted internet searches for "jewish elementary schools in Chicago," and searched the website for ATT – the umbrella organization governing all Jewish schools in Chicago. The threat letter defendant composed was addressed exclusively to Jewish victims. No matter what the (purported) motivation, this intentional selection of a protected class of victims runs afoul of § 3A1.1(a), and is a wholly appropriate basis upon which to apply the three-level enhancement.

**C.      There is No Basis for a Two-Point Reduction under § 3E1.1(a).**

Defendant argues that "it would not be fair to deny Mohammad responsibility acceptance points because he was unable to give this Court sufficient answers to complex state of mind questions or because Counsel attempted to test the sufficiency of the indictment." Def. Version of the Offense at 5.  Given the procedural posture of the case, as well as defendant's statements both before and after trial, defendant is not entitled to two points for acceptance of responsibility.

Section 3E1.1(a) provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."  U.S.S.G. § 3E1.1(a). However, as Application Note 2 makes clear, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." § 3E1.1(a), App. Note 2.  Application Note 2 further explains that, only in "rare situations" will conviction by trial not automatically preclude a defendant from consideration for such a reduction.  *Id*.  Moreover, Application Note 2 instructs that "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."  *Id*.

This is not a rare situation of the type described in Application Note 2, where defendant went to trial "to assert and preserve issues that do not relate to factual guilty (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)."  *Id*.  Here, defendant went to trial because he wished to put the Government to its burden of proof at trial by denying the essential factual elements of guilt.

Furthermore, defendant's pre-trial statements and conduct clearly reflect a lack of interest in accepting responsibility, and he continues post-trial to fail to accept responsibility.  In fact,

defendant continues to blame his actions on anything and anybody besides himself. For example, in his February 2, 2010 attempt to plead guilty, defendant claimed that he "was under the influence when actually that happened," and then he claimed that he did not know what was he was doing when he issued the threats. 02/01/10 Hearing Trans. at 20. Because he maintained that he was not acting intentionally, this Court concluded that defendant did not acknowledge his guilt under oath. *Id*. at 21. Now, even in his recent letter to the Court, defendant casts blame for the crime on his wife and the marital discord he allegedly faced in the days before he sent the threat letter. Def. 08/27/10 Letter to the Court.

Under the circumstances, after a trial has been conducted, and because defendant persists in blaming for his crime anything and anybody but himself, it would be unprecedented for defendant to be awarded two points for acceptance of responsibility. *See, e.g.*, *United States v. Chandler*, 12 F.3d 1427, 1435 (7th Cir. 1994) (affirming district court's refusal, following a trial, to award a defendant two points for acceptance of responsibility where defendant "persist[ed] in his complete absolute denial of every facet of the charges against him.")(internal transcript citation omitted).

### D. There is No Basis for a Downward Departure Under § 5H1.3.

Defendant is incorrect that he is eligible for a downward departure under § 5H1.3. As the plain language of § 5H1.3 provides, "[m]ental and emotional conditions are not ordinarily relevant in determining whether a departure is warranted, excepted as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)." U.S.S.G. § 5H1.3. *See United States v. Roach*, 296 F.3d 565, 568 (7th Cir. 2002) (recognizing that "[e]motional and mental disorders are ordinarily not a basis for departing from the prescribed sentence."). Put simply, a defendant's mental or emotion condition is a discouraged basis for departure. *United States v. Mansoori*, 304 F.3d 635, 676 (7th

Cir. 2002) (finding § 5H1.3 is "a disfavored ground for departure"). Discouraged factors are "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." *United States v. Carter*, 122 F.3d 469, 473 n.5 (7th Cir. 1997).

Defendant speculates that he was depressed due to his domestic problems[1] and/or suffered an unspecified psychological condition occasioned by the fact that his parents were first-cousins and he is thus the apparent offspring in a consanguineous marriage. Def. Version of the Offense at 6. In similar cases, where a defendant asserted an unspecified "psychological" condition as an alleged basis for a departure under § 5H1.3, the Seventh Circuit has concluded that such a condition does not provide a basis for a departure. *See, e.g., United States v. Grasser*, 312 F.3d 336, 341 (7th Cir. 2002)(finding that "psychological" condition, a discouraged basis for a departure, did not provide a basis for departure.).

To the extent that defendant argues that his act was "aberrant behavior," that also is not a basis for a departure in this case. A downward departure may be granted if the criminal act is deemed to be "aberrant behavior." The Sentencing Commission defines the term "aberrant behavior" as "a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." § 5K2.20. *See also United States v. Mallon*, 345 F.3d 943, 950 (7th Cir. 2003)(citing U.S.S.G. § 5K.2.20). However, an "elaborately planned crime"

---

[1]The PSR notes that counsel for defendant provided a psychiatric evaluation that states "a diagnosis of adjustment disorder with depression and anxiety." PSR at 9. According to that evaluation, defendant was treated with common anti-depressant medications for an unspecified duration, and he continued to see a psychologist until January 6, 2010. Defendant also informed the Probation Officer that he sees a counselor while awaiting sentencing, and that he continues to take a "previously-prescribed medication for depression."

-- which this case surely represents, given the evidence at trial -- has been deemed as not worthy of a departure for "aberrant behavior). *Mallon*, 345 F.3d at 950. The multitude of reasons cited above, *infra* p. 5, which reflect why defendant's conduct should not be deemed worthy of a reduction under § 2A6.1(b)(6), also militate against a downward departure for aberrant behavior.

### III. The Section 3553(a) Factors Warrant a Sentence at the High-End of the Guidelines.

Several § 3553(a) factors make clear that a sentence at the high-end of the Guidelines range is sufficient, but not greater than necessary, to comply with the factors set forth in § 3553(a).

### A. The Nature and Circumstances of the Offense

Without belaboring the issues recited above, defendant's crime was a despicable act which caused much pain and anguish to a community which included numerous children. The IJCA and its fellow institutions were left with a permanent loss of their sense of security. That loss, which is metaphorically represented by the safety wall that now exists inside the IJCA -- a wall constructed solely in response to defendant's threat -- is something that the Court's punishment must take into account. A sentence at the high-end of the Guidelines range will reflect the seriousness of the offense, including the calculated, deliberate steps that defendant took in order to carry out his threat.

### B. The Need to Promote Respect for the Law and to Afford Adequate Deterrence

A sentence at the high-end of the Guidelines range will also promote respect for the law and promote the goals of both specific and general deterrence. Specific deterrence is clearly a problem in this case. Defendant has not acknowledged the seriousness of his offense, and has utterly failed to accept responsibility for the crime and the lasting impact on its victims. A high-end sentence will also help to generally deter others, by sending a message that threats like that here are taken seriously and will result in significant consequences for those who engage in such behavior.

## C.        The Need to Provide Just Punishment

Defendant attempts to re-characterize his crime as a politically-motivated act by a depressed father, who never intended to carry out the threat.  However, the Court should consider the real-life consequences of the offense.  As a result of this letter, defendant left a lasting, harmful impact on a community that once felt safe and secure within its own confines.  It is ironic that defendant attempts to explain away his involvement in the offense by citing his concerns about his son's safety.  Never once does defendant acknowledge that his offense caused hundreds of parents to experience very real terror regarding the safety of *their* children.  A high-end sentence is a just punishment for this calculated offense, which wreaked havoc in the lives of defendant's victims.

## IV.      Conclusion

For the foregoing reasons, the Government respectfully requests that the Court sentence defendant Mohammad Alkaramla to a term of imprisonment at the high-end of the applicable Guidelines range of 18 to 24 months.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

Dated: September 24, 2010            By:      /s/ Kartik K. Raman
KARTIK K. RAMAN
MEGHAN C. MORRISSEY
Assistant United States Attorneys
219 South Dearborn Street, Rm. 500
Chicago, Illinois  60604

13

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that in accordance with

Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

GOVERNMENT'S SENTENCING MEMORANDUM

was served this day pursuant to the district court's ECF system as to all ECF filers.

PATRICK J. FITZGERALD
United States Attorney


DATED: September 24, 2010          By:     /s/ Kartik K. Raman
                                           KARTIK K. RAMAN
                                           Assistant United States Attorney
                                           219 South Dearborn Street, Rm. 500
                                           Chicago, IL  60604
                                           (312) 353-5300